# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1750 | **DATE** | December 10, 2003 |
| **CASE TITLE** | James A. Baker, et al v Alfred D. Kingsley, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____ .
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(7) ☐ Trial[set for/re-set for] on _____ at _____ .
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ Memorandum opinion and order entered. Defendants' Rule 12(b)(6) motion to dismiss count II for failure to state a claim is granted and service is quashed as to defendant Richard Katz. Count I which the court concludes is not preempted by Section 301 of LMRA is remanded to the Circuit Court for the 19th Judicial Circuit, Lake County, Il.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| X | Notices mailed by judge's staff. | DEC 1 2 2003 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | 46 |
| | Copy to judge/magistrate judge. | | |
| GDS | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES A. BAKER, RAYMOND WOLFE, and )
WILLIAM PATE, on behalf of themselves and all )
others similarly situated, )
)
Plaintiffs, )
) No. 03 C 1750
v. )
) Judge Robert W. Gettleman
ALFRED D. KINGSLEY, GARY D. )
DUBERSTEIN, JAMES RUSK, DAVID D. )
JONES, JR., ROGER L. FIX, RICHARD KATZ, )
RONALD HIRAM, FRANK SICA, and )
GREENMARINE HOLDINGS, LLC., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs James Baker, Raymond Wolfe, and William Pate, individually and on behalf of all others similarly situated, initiated the instant suit through the filing of a one-count complaint in the Circuit Court for the Nineteenth Judicial Circuit, Lake County, Illinois, against defendants Alfred Kingsley, Gary Duberstein, James Rusk, David Jones, Jr., Roger Fix, and Greenmarine Holdings, LLC., arising from an alleged violation of the Illinois Wage Payment and Collection Act, 820 ILCS § 115/5. After defendants removed the instant case to this court, plaintiffs filed a first amended complaint which added a claim under the fiduciary provisions of Sections 102 and 404 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1022 and 1104 (Count II). On May 29, 2003, the court granted plaintiffs' motion to voluntarily dismiss James Rusk, add defendants

Richard Katz, Ronald Hiram, and Frank Sica, and file a second amended complaint which was "revised solely for the purpose of adding and dropping such parties."[1]

Defendants Kingsley, Duberstein, Fix, Sica, and Greenmarine Holdings LLC have moved to dismiss Counts I and II pursuant to Fed. R. Civ. P. 12(b)(6), and defendant Katz has moved to dismiss based on improper service pursuant to Fed. R. Civ. P. 12(b)(2) & (5). For the reasons stated below, the court grants defendants' motion to dismiss Count II, quashes service as to Katz, and remands Count I, which is not preempted by federal law, to state court.

## FACTS

Baker and Wolfe, named plaintiffs in Count I of the second amended complaint, were employees of the Waukegan, Illinois, manufacturing and production facility of Outboard Marine Corporation ("OMC"). According to the second amended complaint, on or about September 11, 1997, Greenmarine completed a takeover of OMC and designated four of OMC's six directors, effectively installing its own management team that included the individual defendants. Defendant David Jones was hired as the president and chief executive officer of OMC, and defendant Roger Fix was hired to replace Jones as president on August 28, 2000. Defendant Alfred Kingsley was nominated to be OMC's chairman.

In September 1999, as part of the takeover, the individual defendants allegedly anticipated having to close OMC's Waukegan plant, preferably over a two-year period. The then-existing collective bargaining agreement of the International Marine and Machinists Association ("IMMA") was set to expire in October 1999, however. Accordingly, the individual defendants allegedly

---

[1] Notwithstanding his effective dismissal from instant case, the court notes that both the caption and introductory allegations of the second amended complaint reference Rusk, and the docket does not reflect his dismissal.

2

negotiated an extension of the collective bargaining agreement by promising to pay IMMA members, including plaintiffs Baker and Wolfe and others similarly situated, certain enhanced severance and retention payments if they worked to the end of the new agreement, or until the shutdown of the Waukegan plant (the "Shutdown Agreement").

Sections 18(f) and 19(f) of the Shutdown Agreement, attached to plaintiffs' original complaint and incorporated by reference into the second amended complaint, provide that retention and severance payments "shall be paid in a lump sum within ten (10) calendar days after the earlier of: (i) ninety (90) calendar days from the date the employee is terminated or permanently laid off, or (ii) the effective date of the sale of the Waukegan plant."

On December 21, 2000, the Waukegan plant was closed by the individual defendants and Greenmarine, and on December 22, 2000, the individual defendants and Greenmarine allegedly caused OMC to file for bankruptcy in the Northern District of Illinois. Although plaintiffs allegedly filed claims for their severance and retention benefits under the Shutdown Agreement against OMC in the bankruptcy court, OMC has not paid plaintiffs.

According to Count I of the second amended complaint, defendants denied plaintiffs their statutory rights under the Illinois Wage Payment and Collection Act (the "Wage Act"), 820 ILCS § 115/5, to have their earned vacation pay, severance pay, and retention pay paid to them upon termination. Plaintiffs allege that IMMA members did not appreciate the likelihood that the entire OMC enterprise might be liquidated (and thus unable to pay plaintiffs' severance and retention benefits).[2]

---

[2]As an aside, plaintiffs also allege that defendants should have set aside funds in separate and fully funded welfare benefit plans to ensure that plaintiffs would receive the payments to
(continued...)

In Count II, plaintiffs Baker, Wolfe and Pate, as participants of the OMC Health Plan, allege that defendants violated their fiduciary duty by failing to inform plaintiffs and others similarly situated that defendants might exercise their purported right to terminate the OMC Health Plan without notice. Although the Summary Plan Description ("SPD") of the OMC Health Plan, which was distributed to all participants, stated that coverage would end when "the Plan is terminated by the Company," it did not specify the manner in which the Plan could be terminated. The OMC Health Plan itself, which was attached as an exhibit to the first amended complaint and incorporated by reference into the second amended complaint, effectively provides that no notice of termination of the OMC Health Plan need be given to plan participants. According to the second amended complaint, however, the OMC Health Plan was not provided to all participants.

The OMC Health Plan defines the Administrator of the plan as "The Committee," which consists of at least three persons appointed by the Board of Directors of the Company. The OMC Health Plan provides that the Committee "shall have full power and authority to administer the Plan, to interpret its provisions, to establish, amend and rescind rules and regulations for its efficient administration and to determine all questions relating to the eligibility of Participants and Dependents hereunder." The OMC Health Plan further provides for the establishment of a "Management Committee," which is appointed by the Board of Directors and responsible for assisting in the investment of the plan's assets.

---

²(...continued)
which they were entitled under the Shutdown Agreement. According to plaintiffs, defendants' failure to do so was to protect Greenmarine's interests in the event that OMC had to declare bankruptcy.

According to plaintiffs, on February 20, 2001, OMC filed a motion in the bankruptcy court to approve the defendants' termination of the OMC Health Plan. Notwithstanding the IMMA's objection to that motion, in which the IMMA asked for a 120-day delay of termination of the OMC Health Plan to permit participants to seek alternative group coverage, the bankruptcy court approved termination of the OMC Health Plan on February 28, 2001. Plaintiffs allege that the individual defendants' failure to notify plaintiffs of the impending termination of the OMC Health Plan prevented them from obtaining alternative insurance without a break in coverage and constitutes a violation of their fiduciary duty under ERISA. Moreover, according to plaintiffs, defendant Greenmarine is liable either as a fiduciary itself, or as a non-fiduciary acting in concert with the individual defendants in breach of their fiduciary duty.

## DISCUSSION

Defendants Kingsley, Duberstein, Jones, Fix, Sica and Greenmarine have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Counts I and II of the second amended complaint. In considering a Rule 12(b)(6) motion, the court is obligated to accept all well-pleaded facts in the counterclaim as true and draw all reasonable inferences in favor of the non-moving party. Northern Trust Co. v. Peters, 69 F.3d 123, 129 (7th Cir. 1995). The consideration of a Rule 12(b)(6) motion is generally restricted to the pleadings, which include the complaint, any exhibits attached thereto, and supporting briefs. Thompson v. Illinois Department of Professional Regulation, 300 F.3d 750, 753 (7th Cir. 2002).

1.  Count II: ERISA

In Count II, plaintiffs Baker, Wolfe, and Pate, on behalf of all active and retired participants in the OMC Health Plan, seek damages and equitable relief "for loss of the health insurance benefits

they could have obtained as a group without a break in coverage if they had received reasonable advance notice of the termination of the OMC Health Plan." In their motion to dismiss, defendants argue that plaintiffs have mischaracterized the termination of the OMC Health Plan as being driven by defendants rather than the February 28, 2001, order of the bankruptcy court. The court agrees.

ERISA, Section 3(21)(A), 29 U.S.C. § 1002(21)(A), states that an individual is a fiduciary with respect to a plan to the extent,

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Accordingly, "a person may be an ERISA fiduciary for some purposes, but not for others." Plumb v. Fluid Pump Service, Inc., 124 F.3d 849, 854 (7th Cir. 1997). "In assessing whether a person can be held liable for breach of fiduciary duty, 'a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue.'" Id. (quoting Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992)).

Plaintiffs' own allegations regarding the bankruptcy proceeding, which have not been challenged by defendants, defeat their claim in Count II that the defendants breached their fiduciary duties to plaintiffs by terminating the OMC Health Plan without adequate notice. According to plaintiffs, on February 20, 2001, OMC filed a motion in the bankruptcy court to approve defendants' termination of the OMC Health Plan pursuant to 11 U.S.C. §§ 1113 and 1114. Thereafter, "the affected unions, including IMMA, asked for a delay of 120 days in any termination of the OMC Health Plan, and shortened that request at the hearing to even a lesser period, so as to permit

participants to seek group coverage without a break in coverage...." The IMMA's request for such a delay was denied.

In an order dated February 28, 2001, of which the court takes judicial notice, the bankruptcy court granted OMC's motion for termination in its entirety and authorized and <u>directed</u> the Debtors to terminate their retiree medical plans "as soon as reasonably practicable."[3] Thus, the amount of notice given to participants regarding the OMC Health Plan termination was dictated by the February 28, 2001, order of the bankruptcy court. As such, the notice, or dearth thereof, afforded participants of the plan's termination was not a matter of the exercise of discretionary authority on the part of the defendants, and cannot be characterized as a breach of fiduciary duty. The court therefore concludes that to the extent Count II is based on inadequate notice regarding the termination of the OMC Health Plan, it fails to state a claim. See Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 129 (7th Cir. 1992) (citing 29 U.S.C. § 1002 (21)(A)) ("ERISA makes the existence of discretion a <u>sine qua non</u> of fiduciary duty.").

As for plaintiffs' allegations regarding defendants' obligation to fund the OMC Health Plan, the court notes that the individual defendants' obligations with respect to the plan's funding were limited to their appointment powers under Section 11.6,[4] which provides:

> The assets of this Plan shall be invested by a "Management Committee." The "Management Committee" shall be appointed by and serve at the pleasure of the

---

[3]According to the February 28, 2001, order, all affected current and retired employees - including plaintiffs - were represented in the §§ 1113 and 1114 proceeding by the United Steelworkers of America, the IMMA, the Official Committee of Retired Employees, and the Pattern, Mold and Model Makers of Chicago and Vicinity.

[4]Section 11.1 additionally provided that the Board of Directors was responsible for appointing the Administrative Committee, consisting of three persons, which would assist in the administration of the OMC Health Plan.

7

Board of Directors of the Company to assist in the investment of the assets of this Plan. Such persons may be the Company's Vice President and Treasurer, Vice-President of Human Resources and the Director of Employee Benefits.... The Management Committee shall have full power and authority to invest and reinvest the assets of the Plan.

Although Section 11.6 suggests that defendants may properly be characterized as fiduciaries with respect to their appointment responsibilities regarding the Management Committee, nothing in the OMC Health Plan suggests that defendants were fiduciaries with respect to the investment of the plan's assets or the plan's funding. In the absence of any allegation that would support a conclusion that defendants were fiduciaries as to funding, rather than merely appointment of the Management Committee,[5] the court concludes that plaintiffs' allegations regarding funding fail to state a claim for breach of fiduciary duty in Count II.

For these reasons, the court dismisses Count II of plaintiffs' second amended complaint.

2.  Count I: Illinois Wage Payment and Collection Act

Defendants assert four grounds for dismissing Count I: (1) plaintiffs' allegations based on the Shutdown Agreement are entirely preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); (2) plaintiffs' failure to file a grievance bars their Wage Act claim; (3) plaintiffs are not citizens of Illinois and thus do not have standing to sue under the Wage Act; and (4) defendants have not "knowingly permitted" a violation of the Wage Act. For the reasons stated below, the court concludes that plaintiffs' Wage Act claim is not preempted by Section 301 of the LMRA. Rather than reach the merits of defendants' remaining arguments, however, the court remands the instant case to state court.

---

[5]The court further notes that the second amended complaint is devoid of allegations that defendants breached their fiduciary duties through the exercise of their appointment powers.

8

Section 301 of the LMRA, 29 U.S.C. § 185(a), provides that "suits for violation of contracts between an employer and a labor organization ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." The parties agree that Section 301 completely preempts all state law claims where the legal character of the claim requires interpretation of the express or implied terms of a collective bargaining agreement.[6] See Atchley v. Heritage Cable Vision Assocs., 101 F. 3d 495, 498-99 (7th Cir. 1996) (citing Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988)) ("If the resolution of a state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement, the application of state law is preempted...."); Lopez v. Smurfit-Stone Container Corp., 2003 WL 297533, at *2 (N.D.Ill. Feb. 10, 2003) (citations omitted) (preemption triggered whenever state law claim is "founded directly on rights created by collective bargaining agreements... and when the resolution of [the] state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement"). A state law claim is not preempted if it merely requires reference to a collective bargaining agreement, however. See In re Bentz Metal Products Co., Inc., 253 F.3d 283, 285 (7th Cir. 2001) ("In what we conclude was too broad a reading of the phrase, the panel held that the ... claims were 'founded on the [collective bargaining agreement]' and thus preempted. We now hold ... that a state law claim is not preempted if it does not require interpretation of the [collective bargaining agreement] even if it may require reference to the [collective bargaining agreement].").

---

[6]The parties agree that the Shutdown Agreement is properly characterized as a collective bargaining agreement.

9

Not surprisingly, the parties dispute whether the resolution of Count I requires interpretation of any clauses of the Shutdown Agreement. Defendants maintain (in their reply brief) that to find defendants liable for knowingly permitting OMC to violate the Wage Act, the court must interpret numerous provisions of the Shutdown Agreement, including: (1) Section 23(d), in which each party "clearly, expressly, and unequivocally waives its rights to bargain with respect to any matter which is set forth in this Agreement, or to bargain further with respect to any matter which is not set forth in this Agreement"; (2) Sections 18(f) and 19(f), which provide that severance and retention payments shall be paid in a lump sum within ten days after the "permanent cessation of operations at the Waukegan plant"; (3) Sections 18(g) and 19(g), which state that OMC "shall deduct from the [retention and severance] payment any amount to be withheld by reason of any law or regulation"; (4) Section 9(a) and Exhibit D to the agreement, which detail the applicable wage rates for "day work," "incentive work," and "piecework"; (5) Sections 18(h) and 19(h), which require employees to sign a "Confidential Release and Severance Agreement" prior to their receipt of severance and retention benefits; and (6) Section 22(e), in which the IMMA "forever discharg[ed]" OMC and its representatives from "any and all claims, grievances, causes of action, demands, suits, losses and liabilities of any kind and description whatsoever, which arise out of, relate to or are in connection with... the shutdown or sale of the Waukegan plant," including claims for benefits.

In response, plaintiffs maintain that defendants' liability is a statutory question rather than a matter of contract interpretation. According to plaintiffs, Section 5 of the Wage Act, 820 ILCS § 115/5, mandated payment of their enhanced benefits on their last day of employment. Section 5 provides, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday...."

10

"Final compensation" is defined as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS § 115/2. Further, "[a]ny officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the Wage Act] shall be deemed to be the employers of the employees of the corporation." 820 ILCS § 115/13.

In Armstrong v. Hedlund Corp., 316 Ill. App. 3d 1097, 1106 (1st Dist. 2000), the Illinois Appellate Court construed Section 5 to require payment of final compensation at the time of separation, and held that workers may file claims for final compensation immediately after termination. An employer may then demonstrate why payment was not possible at the time of separation; however, according to the Armstrong court, the right to demand payment accrues at the time of separation.

The court agrees that the duty to pay plaintiffs' final compensation on the date of separation is a matter of state law rather than of contract interpretation. In Livadas v. Bradshaw, 512 U.S. 107, 124-125 (1994), the Supreme Court rejected the argument that an analogous California wage law, Cal. Labor Code §§ 201 and 203, was preempted by § 301 because the only issue raised by the plaintiff's claim - specifically, that her former employer "willfully fail[ed] to pay" her wages promptly upon severance - "was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer." In reaching this conclusion, the court added that, "[b]eyond the simple need to refer to bargained-for wage rates in computing the penalty [due plaintiff], the collective-bargaining agreement is irrelevant to the dispute (if any) between [plaintiff] and [her former employer]." See also Balcorta v. Twentieth

11

Century-Fox Film Corp., 208 F.3d 1102, 1111 (9th Cir. 2000) (Claim under § 201.5 of California Labor Code, which governs timeliness of payments after discharge for motion picture industry employees, was not preempted because "whether a violation has occurred is controlled only by the provisions of the state statute and does not turn on whether the payment was timely under the provisions of the collective bargaining agreement.").

As in Livadas and Balcorta, the state law at issue in the instant case is clear: payment of final compensation is due at the time of separation, if possible, but in no event later than the next scheduled payday.[7] Accordingly, determining whether defendants knowingly permitted OMC to violate this provision does not require interpretation of the Shutdown Agreement.[8]

---

[7]Although defendants maintain (in a footnote in their reply brief) that it is not clear whether the Wage Act always trumps payment provisions found in collective bargaining agreements, two other courts in this district have concluded that the rights conferred by the Wage Act are nonwaivable. See O'Brien v. Encotech Const. Services, Inc., 183 F. Supp. 2d 1047, 1050 (N.D.Ill. Jan 23, 2002) ("The [Illinois] legislature is clearly stating that the larger public purposes served by [laws such as the Wage Act] trump individual contract rights."); Ladegaard v. Hard Rock Concrete Cutters, Inc., 2001 WL 1403007, at *6 (N.D.Ill. Nov. 9, 2001) (citations omitted) (noting that "the Illinois Supreme Court has recognized that where the right in question is conferred for the benefit of the public at large rather than solely for the private benefit of individuals, the right is nonwaivable," and that Illinois courts have recognized that the Wage Act involves public rights).

[8]If defendants contested that plaintiffs had actually earned the compensation to which they claim they were entitled, an arguable issue of contract interpretation would arise in the instant dispute. Aside from vaguely contesting liability, however, defendants have not directed the court's attention to any contractual provisions that might defeat plaintiffs' claim that they had earned the benefits at issue in the instant dispute. Accordingly, Krygowski v. AT&T Corp., 2003 WL 164223 (N.D.Ill. Jan 23, 2003), and Lopez v. Smurfit-Stone Container Corp., 2003 WL 297533 (N.D.Ill. Feb. 10, 2003), on which defendants rely, are inapposite. Moreover, as plaintiffs note without contradiction by defendants, their former employer, OMC, did not contest liability of their wage claims in the bankruptcy court, further supporting plaintiffs' position that liability for the compensation due under the Shutdown Agreement is uncontested.

12

The court recognizes that certain terms of the contract, such as section 9(a), which defines hourly rates for "incentive work" and "day work," must be referenced in order to calculate the extent of plaintiffs' damages, in the event that defendants are found liable. Determination of damages, however, "is not the sort of 'substantial dependence' on a labor agreement that mandates section 301 preemption." Baldracchi v. Pratt & Whitney Aircraft Div., United Technologies Corp., 814 F.2d 102, 106 (2d Cir. 1987). As the Supreme Court noted in Lingle, 486 U.S. at 411, n. 12 (citation omitted):

> A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted.

Accordingly, the court concludes that Count I, which is based on a violation of Section 5 of the Wage Act, is not preempted by Section 301 of the LMRA. Because the court has already dismissed Count II, the court notes that there remains no basis for exercising federal jurisdiction over the instant dispute, which consists solely of plaintiff's Wage Act claim. Accordingly, the court remands the instant case to state court, and need not reach the merits of defendants' other arguments in support of dismissal (catalogued in footnote 6 of defendants' opening brief), with the exception of defendant Katz's motion to dismiss, which is addressed briefly below.

3.  Defendant Katz's Motion to Dismiss for Improper Service

Defendant Katz moved pursuant to Fed. R. Civ. P. 12(b)(2) and (5) to dismiss plaintiffs' claims against him for improper service. Katz, a former director of OMC, is a resident of Italy. On July 29, 2003, plaintiffs filed a "return of service" with the court, which included a summons for Katz and, attached to that summons, (1) a copy of a Federal Express International Waybill purporting to show a transmittal of unspecified contents from plaintiffs' counsel to Mr. Katz, and (2) a printout from the Federal Express Internet website stating that a package corresponding with the copied label was signed for by ".MORO" on June 17, 2003. Plaintiffs did not file a certificate or affidavit of service, a marshal's return, or any other document indicating that Katz received proper service.

Fed. R. Civ. P 4(f) states that service upon individuals outside of the United States may be effected by "any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." The Hague Convention, of which Italy is a signatory, allows for service by forwarding a request to the Central Authority of the State where service is required; upon service, the Central Authority completes a certificate which "states that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered." Article 10(a) of the Hague Convention alternatively provides for the service of judicial documents "by postal channels" directly to persons abroad, provided that the state of destination does not object.

"Once a defendant has challenged the sufficiency of service of process with a motion to dismiss under Fed. R. Civ. P. 12(b)(5), the burden is on the plaintiff to make a prima facie showing that there was proper service." Iosello v. Lexington Law Firm, No. 03 C 987, 2003 WL 2190237, at *2 (N.D.Ill. Aug. 7, 2003) (citation omitted). In an effort to meet that burden, plaintiffs assert that

they properly served Katz pursuant to Article 10(a) of the Hague Convention. This argument is unavailing, however, in light of plaintiffs' failure to produce an affidavit of service or any other evidence to show that Katz personally received the summons and complaint from plaintiffs. Their assertion, without any evidentiary support, that ".MORO" was "[p]resumably a person... at the reception desk of [Katz's] address," is wholly inadequate to satisfy their burden. Accordingly, the court quashes service as to Katz.[9]

## CONCLUSION

For the reasons stated herein, the court grants defendants' Rule 12(b)(6) motion to dismiss Count II for failure to state a claim and quashes service as to Katz. Count I, which the court concludes is not preempted by Section 301 of the LMRA, is remanded to state court.

**ENTER:** **December 10, 2003**

Robert W. Gettleman
United States District Judge

---

[9]The court notes that the parties dispute whether the appropriate course of action is to quash service or dismiss Katz altogether. Because the instant suit is being remanded, rather than dismissed, the court elects to quash service, presuming that plaintiffs will attempt to re-serve Katz once back in state court.